# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

FERNANDO ROJAS,
Defendant and Appellant.

S275835

Fifth Appellate District
F080361

Kern County Superior Court
BF171239B

December 18, 2023

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Evans concurred.

PEOPLE v. ROJAS

S275835


Opinion of the Court by Liu, J.


In 2000, California voters adopted Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998 (Proposition 21). Proposition 21 added the gang-murder special circumstance, codified at Penal Code section 190.2, subdivision (a)(22) (section 190.2(a)(22)). (All undesignated statutory references are to the Penal Code.) Under this provision, a person convicted of first degree murder is subject to the death penalty or life imprisonment without the possibility of parole if the jury finds "[t]he defendant intentionally killed the victim while the defendant was an active participant in *a criminal street gang, as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2(a)(22), italics added.) Proposition 21 does not permit amendment of its provisions except by the voters or by legislative amendment passed with a two-thirds majority of each house. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 39, p. 131.)

The definition of a "criminal street gang" in section 186.22, subdivision (f) (section 186.22(f)) was first enacted in 1988 as part of the California Street Terrorism Enforcement and Prevention Act (STEP Act) (§ 186.20 et seq.), which created the offense of active participation in a gang and introduced sentencing enhancements for gang-related felonies. (Stats. 1988, ch. 1256, § 1, p. 4179; see Pen. Code, § 186.22, subds. (a), (b)(2).) The Legislature has amended the definition of "criminal

street gang" a few times over the years, generally expanding its scope. But in 2021, the Legislature substantially narrowed section 186.22(f)'s definition of "criminal street gang" and, by extension, what it means to "further the activities of the criminal street gang" for purposes of the special circumstance in section 190.2(a)(22). (See Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333).)

The issue before us is whether applying this recent legislative enactment, Assembly Bill 333, to the gang-murder special circumstance in section 190.2(a)(22) constitutes an unlawful amendment of Proposition 21. The issue has divided the Courts of Appeal. (Compare *People v. Rojas* (2022) 80 Cal.App.5th 542, 557 [Assembly Bill 333's amendments to § 186.22 cannot be applied to the gang-murder special circumstance without taking away from the scope of conduct made punishable under Proposition 21] with *People v. Lee* (2022) 81 Cal.App.5th 232, 245, review granted and briefing deferred Oct. 19, 2022, S275449 (*Lee*) [Assembly Bill 333 did not amend Proposition 21, which was intended to track any subsequent changes to § 186.22] and *People v. Oliva* (2023) 89 Cal.App.5th 76, 90, review granted and briefing deferred May 17, 2023, S279485 [same].) We hold that the application of Assembly Bill 333 to the gang-murder special circumstance does not violate the limitation on legislative amendment in Proposition 21.

## I.

In 2019, Fernando Rojas and his codefendant Victor Nunez were found guilty of deliberate, premeditated murder (§ 187, subd. (a)) with true findings on the gang-murder special circumstance (§ 190.2(a)(22)), a gang enhancement (§ 186.22, subd. (b)(1)), and various firearm allegations (§§ 12022,

subd. (d), 12022.53, subds. (d) & (e)). Nunez, a fellow gang member, "shot and killed an individual with whom [Rojas] had an altercation moments prior." (*Rojas*, *supra*, 80 Cal.App.5th at p. 546.) Rojas and Nunez were also found guilty of active participation in a criminal street gang. (§ 186.22, subd. (a).) Based on the special circumstance finding, the trial court sentenced Rojas to life imprisonment without the possibility of parole, plus 25 years to life for the firearm enhancement.

In 2021, while Rojas's appeal was pending, the Legislature passed Assembly Bill 333, enacting the STEP Forward Act of 2021. (Stats. 2021, ch. 699, § 1.) "Assembly Bill 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an

offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*); see *People v. Cooper* (2023) 14 Cal.5th 735, 738 [same].)

In *Tran*, we held that Assembly Bill 333's amendments to section 186.22 apply retroactively to cases pending on appeal under the rule of *In re Estrada* (1965) 63 Cal.2d 740. (*Tran, supra,* 13 Cal.5th at pp. 1206–1207.) In light of *Tran*, the Attorney General conceded below that Assembly Bill 333 applies here and that because a reasonable jury could conclude that the common benefit of the murder was based only on reputational evidence, all the gang-based findings must be vacated, except for the gang-murder special circumstance. (*Rojas, supra,* 80 Cal.App.5th at p. 546.) Accepting this concession, the Court of Appeal reversed the gang enhancement and vicarious firearm findings on Rojas's murder conviction and his conviction of active gang participation. (*Ibid.*) But the court also agreed with the Attorney General that Assembly Bill 333 could not be applied to the gang-murder special circumstance. (*Rojas,* at pp. 550–558.)

The Court of Appeal reasoned that Assembly Bill 333, as applied to the gang-murder special circumstance, is unconstitutional because it would " 'take[] away' from the scope of conduct that Proposition 21 made punishable under section 190.2" and was not passed by a supermajority vote. (*Rojas, supra,* 80 Cal.App.5th at p. 555.) The court further explained that Proposition 21's increase in the punishment for certain gang-related murders was "definitionally and conceptually inseparable" from the gang conduct defined in section 186.22. (*Rojas,* at p. 556.) Therefore, applying Assembly Bill 333's

revised definition of a criminal street gang to the gang-murder special circumstance would be unconstitutional, even though Assembly Bill 333 did not reduce the penalty established by Proposition 21's gang-murder special circumstance. (*Rojas*, at p. 556.) The court concluded that "[t]he appropriate remedy is not to void Assembly Bill 333 in its entirety, but rather to disallow this unconstitutional application of Assembly Bill 333." (*Id.* at p. 557.)

Justice Snauffer dissented on this issue, observing that the voters who passed Proposition 21 were concerned only with "increasing the punishment for certain gang-related murders," not with the underlying definition of any crime. (*Rojas*, *supra*, 80 Cal.App.5th at p. 561 (conc. & dis. opn. of Snauffer, J.).) In his view, Proposition 21's voters " 'got, and still have, precisely what they enacted — stronger sentences for persons convicted of [gang-related special-circumstance] murder.' " (*Rojas*, at p. 560, quoting *People v. Superior Court (Gooden)* 42 Cal.App.5th 270, 289 (*Gooden*).)

We granted review to decide whether Assembly Bill 333's application to the gang-murder special circumstance unconstitutionally amends Proposition 21.

## II.

"The Legislature may not amend an initiative statute without subsequent voter approval unless the initiative permits such amendment, 'and then only upon whatever conditions the voters attached to the Legislature's amendatory powers.' " (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 568 (*Pearson*); see Cal. Const., art. II, § 10, subd. (c).) "The purpose of California's constitutional limitation on the Legislature's power to amend initiative statutes is to 'protect the

people's initiative powers by precluding the Legislature from undoing what the people have done, without the electorate's consent.' " (*Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1484.)

"We have described an amendment as 'a legislative act designed to change an existing initiative statute by adding or taking from it some particular provision.' [Citation.] But this does not mean that any legislation that concerns the same subject matter as an initiative, or even augments an initiative's provisions, is necessarily an amendment for these purposes. 'The Legislature remains free to address a " 'related but distinct area' " [citations] or a matter that an initiative measure "does not specifically authorize *or* prohibit." ' " (*Pearson, supra*, 48 Cal.4th at p. 571.)

"When we interpret an initiative, we apply the same principles governing statutory construction. We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure." (*Pearson, supra*, 48 Cal.4th at p. 571.)

## A.

California voters enacted Proposition 21 in 2000, increasing the penalties for certain gang-related felonies. As relevant here, Proposition 21 created the gang-murder special

circumstance, codified at section 190.2(a)(22). (*People v. Shabazz* (2006) 38 Cal.4th 55, 65.) Section 190.2(a)(22) provides: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] (22) The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." By its terms, Proposition 21 established a new penalty for murder committed by an active participant in a criminal street gang in furtherance of the gang's activities, while relying on an existing statutory provision — section 186.22(f) — to define "criminal street gang."

An uncodified provision of Proposition 21 states that the provisions of the initiative "shall not be amended by the Legislature except by a statute passed in each house by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, or by a statute that becomes effective only when approved by the voters." (Voter Information Guide, Primary Elec., *supra*, text of Prop. 21, § 39, p. 131.) Assembly Bill 333 did not receive two-thirds support in either house (Sen. Daily J. (Sept. 1, 2021) p. 2284 [25 of 40 members voted in favor]; Assem. Daily J. (Sept. 8, 2021.) p. 2927 [41 of 80 members voted in favor]; see Cal. Const., art. IV, § 2, subd. (a)(1)–(2)), nor was the bill submitted to the voters for approval. The Attorney General argues that Assembly Bill 333's amendment of section 186.22, incorporated by reference into section 190.2(a)(22), unconstitutionally amends Proposition 21 because the voters intended the enhanced punishment of death or life without

parole to apply to gang murders as defined at the time Proposition 21 was enacted.

Although Proposition 21 amended section 186.22 by increasing the punishment of certain enhancements (§ 186.22, subds. (b), (c), (d)) and adding predicate offenses in determining "a pattern of criminal gang activity" (*id.*, subd. (e)), the 2000 initiative did not amend section 186.22(f)'s definition of "criminal street gang" and instead technically reenacted it without substantive change. (See *County of San Diego v. Commission on State Mandates* (2018) 6 Cal.5th 196, 209–210 ["Statutory provisions that are not actually reenacted and are instead considered to ' "have been the law all along" ' [citation] cannot fairly be said to be part of a ballot measure"]; Gov. Code, § 9605.) It follows that the Legislature is free to revise section 186.22(f) independent of the supermajority requirement in Proposition 21 itself unless the reenacted provision "is integral to accomplishing the electorate's goals in enacting the initiative or other indicia support the conclusion that voters reasonably intended to limit the Legislature's ability to amend that part of the statute." (*County of San Diego,* at p. 214; see also *Lee*, *supra*, 81 Cal.App.5th at p. 242, rev.gr.; cf. Cal. Const., art. II, § 10, subd. (c); Voter Information Guide, Primary Elec., *supra*, text of Prop. 21, § 39, p. 131.)

The Attorney General argues that applying Assembly Bill 333's amendment to section 186.22(f) to a special circumstance allegation would frustrate the voters' intent to "lock in" the definition of "criminal street gang" as it existed at the time of the 2000 election and would "take away" from the purpose of Proposition 21. We address these arguments in turn.

**B.**

We begin with the text of the initiative statute. We have said that " 'where a statute adopts by specific reference the provisions of another statute, regulation, or ordinance, such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified, and that the repeal of the provisions referred to does not affect the adopting statute, in the absence of a clearly expressed intention to the contrary.' " (*Palermo v. Stockton Theatres* (1948) 32 Cal.2d 53, 58–59 (*Palermo*); see generally *Jam v. International Finance Corp.* (2019) 586 U.S. __, __ [139 S.Ct. 759, 769] [referring to this principle of statutory construction as the " 'reference' canon"].) At the same time, " 'there is a cognate rule . . . to the effect that where the reference is general instead of specific, such as a reference to a system or body of laws or to the general law relating to the subject in hand, the referring statute takes the law or laws referred to not only in their contemporary form, but also as they may be changed from time to time . . . .' " (*Palermo*, at p. 59.)

While *Palermo* sets forth the general rule above, it also makes clear that the presence or absence of language referring specifically to a statutory or regulatory provision is not necessarily dispositive. At issue in *Palermo* was the California Alien Land Act (Stats. 1921, p. lxxxiii, as amended by Stats. 1923, p. 1021), which referred to " ' "any treaty now existing" ' " at the time of the act's enactment by the electorate. (*Palermo, supra,* 32 Cal.2d at p. 59.) *Palermo* reasoned that "in view of the fact that there is grave doubt whether our Legislature could constitutionally delegate to the treaty-making authority of the United States the right and power thus directly to control our local legislation with respect to future acts [citations], we are

constrained to hold that the reference is specific and not general' " (*id.* at pp. 59–60), even though the act did not refer to any specific treaty. We have observed that "[s]everal modern decisions have applied the *Palermo* rule, but none have done so without regard to other indicia of legislative intent." (*In re Jovan B.* (1993) 6 Cal.4th 801, 816, fn. 10 (*Jovan B.*); see *id.* at p. 816 [" 'the determining factor will be . . . legislative intent' "].)

Our application of the *Palermo* rule in *Jovan B.* is instructive. In that case, we considered legislation that incorporated by reference a provision of the Uniform Determinate Sentencing Act (§ 1170 et seq.), commonly referred to as the determinate sentencing law (DSL), into section 726 of the Welfare and Institutions Code as a basis for calculating a juvenile's maximum time of confinement or commitment. The question was whether the Legislature intended to lock in the provisions of the DSL in effect at the time. (*Jovan B.*, *supra*, 6 Cal.4th at pp. 815–816.) We concluded that it did not and held that a juvenile's maximum time of confinement or commitment takes into account enhanced penalties incorporated into the DSL after Welfare and Institutions Code section 726 was enacted. (*Jovan B.*, at pp. 816, 820.) We explained that although the statute referred to two specific provisions of the DSL (§ 1170, subd. (a)(2) and § 1170.1, subd. (a)) those provisions merely "stated the general rule that when sentencing a felon to prison, the court must impose either the upper, middle, or lower term provided for the offense at issue, plus 'any other . . . additional term' required or permitted by law in the individual case." (*Jovan B.*, at p. 818.) "Thus, in the language of *Palermo*, *supra*, 32 Cal.2d 53, 58–59, Welfare and Institutions Code section 726's reference to Penal Code sections 1170, subdivision (a)(2) and 1170.1, subdivision (a) is not a 'specific

reference [to] the provisions of another statute,' but rather is a 'general' reference 'to a system or body of laws.' " (*Jovan B.*, at p. 819.)

*Jovan B.* went on to consider the purpose of the amendment of Welfare and Institutions Code section 726, which "states a broad general rule that the 'maximum term of imprisonment' for juvenile confinement purposes includes 'enhancements' if they are pled and proven." (*Jovan B.*, *supra*, 6 Cal.4th at p. 819.) "The obvious purpose . . . was 'to treat adult and juvenile offenders on equal footing as far as the [maximum] duration of their incarceration is concerned' [citation], whatever that period might be at the moment." (*Ibid.*) We concluded: "The Legislature cannot have anticipated that in order to preserve this equality over time, it would be forced to amend section 726 each and every time it altered the DSA." (*Ibid.*) In light of this determination, we held that the juvenile was subject to the special allegation under Penal Code section 12022.1 that he had committed the offense in question while out of custody pending trial on a prior petition, even though that provision of the Penal Code was enacted five years after Welfare and Institutions Code section 726. (*Jovan B.*, at pp. 807–808, 815.)

Here, as in *Jovan B.*, the words of the incorporating statute "do not make clear whether it contemplates only a time-specific incorporation." (*Jovan B.*, *supra*, 6 Cal.4th at p. 816.) The initiative's uncodified findings and declarations state: "Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties. Life without the possibility of parole or death should be available for murderers who kill as part of any gang-related activity." (Voter

11

Information Guide, Primary Elec., *supra*, text of Prop. 21, § 2, subd. (h), p. 119.) To that end, the electorate chose to impose a specific punishment for gang-related murder while relying on the generally applicable definition of "criminal street gang" in section 186.22(f). The voters gave no indication in the statute that they intended to adopt the definition of "criminal street gang" in effect at the time. Like the statutory references in *Jovan B.*, the reference to section 186.22(f)'s definition of "criminal street gang" in Proposition 21 is readily understood as a reference "to the general law relating to the subject in hand," and as such, "the referring statute takes the law . . . referred to not only in [its] contemporary form, but also as [it] may be changed from time to time." (*Palermo*, *supra*, 32 Cal.2d at p. 59.)

The Attorney General argues that the provisions at issue in *Jovan B.* are "materially different" from those at issue here because Proposition 21 refers "to a specific code section and subdivision defining a particular term" in contrast to the "general incorporation of an entire body or system of laws as in *Jovan B.*" But section 186.22(f) sets forth the definition of "criminal street gang" that is applied throughout the STEP Act and other parts of the Penal Code. For example, the general definition of " '[o]rganized crime' " in section 186.2, subdivision (d) was amended in 1996 to "also mean[] crime committed by a criminal street gang, as defined in" section 186.22(f). (Stats. 1996, ch. 844, § 1, p. 4465.) The penalty for knowingly supplying, selling, or giving possession or control of a firearm with the knowledge that the person will use it to commit a felony for the benefit of a gang, enacted in 1992, also relies on the definition of "criminal street gang" in section 186.22(f). (§ 186.28, subd. (a)(1); see Stats. 1992, ch. 370, § 1, p. 1405.) So, too, does the provision for motor vehicle forfeiture when a

member of a criminal street gang is convicted of the unlawful possession of a firearm while present in a vehicle, as amended in 1993. (§ 246.1, subd. (a); see Stats. 1994, 1st Ex. Sess., ch. 33, § 1, p. 8659.) Since 1994, the Welfare and Institutions Code has also relied on section 186.22 to define "criminal street gang" in providing for information-sharing among "members of a juvenile justice multidisciplinary team engaged in the prevention, identification, and control of crime, including, but not limited to criminal street gang activity." (Welf. & Inst. Code, § 830.1; see Stats. 1994, 1st Ex. Sess., ch. 24, § 1, p. 8597.) Each of these provisions was in place prior to the enactment of Proposition 21, and we presume the voters were aware of the generally applicable nature of section 186.22(f)'s definition of "criminal street gang" when they enacted Proposition 21. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1048 (*Professional Engineers*) ["The voters are presumed to have been aware of existing laws at the time the initiative was enacted."].)

Of course, it is the electorate's prerogative to give the term "criminal street gang" a fixed meaning if it chooses, regardless of how the Legislature may subsequently define the term. But the voters who enacted Proposition 21 did not specify that the cross-reference to section 186.22(f) was intended to lock in the contemporary definition, and this omission is particularly salient in light of other aspects of the same enactment that did just that.

Sections 14 and 16 of Proposition 21 amended portions of the existing "Three Strikes Law." Section 14 added section 667.1 to the Penal Code: "Notwithstanding subdivision (h) of Section 667, for all offenses committed on or after the effective date of this act, all references to existing statutes in subdivisions

(c) to (g), inclusive, of Section 667, are to those statutes as they existed on the effective date of this act, including amendments made to those statutes by this act." (Voter Information Guide, Primary Elec., *supra*, text of Prop. 21, § 14, p. 123, italics omitted.) Similarly, section 16 added section 1170.125 to the Penal Code: "Notwithstanding Section 2 of Proposition 184, as adopted at the November 8, 1994 General Election, for all offenses committed on or after the effective date of this act, all references to existing statutes in Section 1170.12 are to those statutes as they existed on the effective date of this act, including amendments made to those statutes by this act." (Voter Information Guide, Primary Elec., *supra*, text of Prop. 21, § 16, p. 124, italics omitted.)

Sections 14 and 16, by their terms, "change[d] the 'lock-in' date for determining the existence of qualifying offenses (such as violent or serious felonies) under the Three Strikes law. Thus, before the passage of Proposition 21, references to existing statutes, such as the law defining violent felonies, in Penal Code section 667 were 'to statutes as they existed on June 30, 1993.' (§ 667, subd. (h).) Section 14 of Proposition 21 provides that references to existing statutes in Penal Code section 667, for all offenses committed on or after the effective date of the initiative, are to those statutes as they existed on the effective date of Proposition 21 (March 8, 2000), including, but not limited to, amendments made to those statutes by this initiative. (§ 667.1.) Section 16 of the initiative makes a corresponding change to the lock-in date for statutes referenced in Penal Code section 1170.12. (§ 1170.125.)" (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 574–575.)

The Attorney General says these provisions "were necessary to convey the electorate's intent that sections 667 and

1170.12, which Proposition 21 did not directly amend, were to implement the initiative's amendments to *other* statutes that sections 667 and 1170.12 referenced and which Proposition 21 did amend." But if the voters' intent was simply to ensure that the cross-referenced list of violent felonies included those updated by Proposition 21, then the phrase "including amendments made to those statutes by this act" in both section 14 and section 16 would have sufficed. Instead, the voters coupled that directive with a reference to "those statutes as they existed on the effective date of this act," thus ensuring that future offenses would be classified in accordance with the scheme then existing. The Attorney General's explanation of sections 14 and 16 does not account for why those provisions are written as they are.

In *People v. Fletcher* (2023) 92 Cal.App.5th 1374, 1379–1382, review granted September 20, 2023, S281282, the Court of Appeal held that the narrower definition of "criminal street gang" in Assembly Bill 333 cannot be applied to determine what constitutes a serious felony for purposes of the Three Strikes Law without running afoul of the limits on legislative amendment set forth in both Proposition 21 and a 2012 initiative, Proposition 36 (Prop. 36, as approved by voters, Gen. Elec. (Nov. 6, 2012)). We do not decide that issue here. We simply observe that the text of Proposition 21 shows the voters understood that cross-referenced statutes may evolve, and they knew how to lock in the meaning of a cross-referenced statute. Yet the voters chose not to do so with respect to the gang-murder special circumstance. (Cf. *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 576 ["When the Legislature 'has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded.' "].)

## C.

The Attorney General's primary argument is that application of Assembly Bill 333 would frustrate the voters' intent by narrowing the scope of conduct covered by the gang-murder special circumstance, thereby "taking away" from Proposition 21. In this context, we have described an amendment as "a legislative act designed to change an existing initiative statute by adding or taking from it some particular provision." (*People v. Cooper* (2002) 27 Cal.4th 38, 44.) To determine whether Assembly Bill 333 impermissibly takes away from Proposition 21, "we must decide what the voters contemplated." (*Pearson*, *supra*, 48 Cal.4th at p. 571; see *Hodges v. Superior Court* (1999) 21 Cal.4th 109, 114 ["the voters should get what they enacted, not more and not less"].)

The Attorney General says application of Assembly Bill 333 here conflicts "with the electorate's manifest intent to substantially augment protections against violent gang crime, including by punishing more harshly 'murderers who kill as part of any gang-related activity' [(Prop. 21, § 2, subd. (h))]." He adds, "It would be strange, in light of that intent, to conclude that the electorate also understood that the Legislature was free to narrow — in potentially significant ways — the scope of the protections that Proposition 21 established." But the phrase "any gang-related activity" in Proposition 21 simply begs the question of what the voters intended "gang-related activity" to mean; it does not indicate that the voters wanted to lock in the then-current definition. The voters chose to define the term "criminal street gang" by reference to the existing statute, section 186.22(f), which had been amended several times by the Legislature before Proposition 21. In so doing, the voters

incorporated a definition that they knew was both changeable and had been repeatedly subject to change.

As originally enacted, the STEP Act defined "criminal street gang" to mean "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (7), inclusive, of subdivision (c), which has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Former § 186.22, subd. (d), added by Stats. 1988, ch. 1256, § 1, p. 4181.) That definition has been amended over the years, both before and after the enactment of Proposition 21. After being recodified in 1991 at section 186.22(f), the definition of "criminal street gang" was expanded in 1993 and 1994 to incorporate additional enumerated predicate offenses. (See Stats. 1993, ch. 601, § 1, p. 3161; Stats. 1993, ch. 1125, § 3, p. 6291; Stats. 1994, ch. 47, § 1, p. 390, eff. Apr. 19, 1994.) Similarly, Proposition 21 added two crimes to the list of predicate offenses and incorporated those into the definition of "criminal street gang." (Prop. 21, § 4 [amending § 186.22, subds. (e), (f)].) The definition of "criminal street gang" has continued to evolve after Proposition 21, in ways that both expand (see Stats. 2006, ch. 596, § 1, p. 4932 [amending § 186.22(f) to incorporate an expanded list of enumerated offenses]) and contract (see Assem. Bill 333) that definition. The voters who enacted Proposition 21 knew that the definition of "criminal street gang" was changeable (see *Professional Engineers, supra,* 40 Cal.4th at p. 1048 [we presume voters are "aware of existing laws at the time the initiative was enacted"]), and there is no indication they

intended to foreclose future changes to the definition or to allow only expansion and not contraction of the definition.

Rather, when the voters adopted Proposition 21 twelve years after the STEP Act was first enacted, they made clear that their purpose was to more severely punish crimes that are gang-related as opposed to crimes that are not gang-related. As noted, the text declares in relevant part that "[g]ang-related felonies should result in severe penalties. Life without the possibility of parole or death should be available for murderers who kill as part of any gang-related activity." (Voter Information Guide, *supra*, text of Prop. 21, § 2, subd. (h), p. 119.) The proponents of Proposition 21 emphasized its focus on stronger penalties for criminal activity by gangs and gang members, explaining that current law "must be strengthened to require serious consequences" in order to protect people "from the most violent juvenile criminals and gang offenders." (Voter Information Guide, argument in favor of Prop. 21, p. 48, italics omitted.) Proponents further argued that "Proposition 21 ends the 'slap on the wrist' of current law by imposing real consequences for GANG MEMBERS, RAPISTS AND MURDERERS who cannot be reached through prevention or education." (*Ibid.*) Nowhere do the arguments in favor of the initiative suggest that the act would redefine or lock in the then-existing definition of "criminal street gang" rather than incorporate a definition that had been and continued to be subject to change.

The purpose of Assembly Bill 333 further confirms that its application here poses no inconsistency with the voters' intent in enacting Proposition 21. By the time the Legislature took up Assembly Bill 333 in 2021, California had more than three decades of experience under the STEP Act. The Legislature was motivated by that experience to narrow the definition of

criminal street gang in order to focus on "true gang-related crimes," having determined that "in practice the original definition of a criminal street gang was not narrowly focused on punishing true gang-related crimes." (*Lee*, *supra*, 81 Cal.App.5th at p. 245, rev.gr.) Assembly Bill 333 did not change the punishment associated with gang crimes, including the punishment of death or life without the possibility of parole for individuals convicted of the gang-murder special circumstance. Instead, consistent with the intent of Proposition 21 to severely punish gang-related crimes, the Legislature in Assembly Bill 333 "redefined the term 'criminal street gang' so as to truly target the population of criminals for which an enhanced punishment is warranted." (*Lee*, at p. 245; see Assem. Com. on Public Safety, Analysis of Assem. Bill 333, as amended Mar. 30, 2021, p. 4 [Assembly Bill 333 " 'ensur[es] gang enhancements are only used when necessary and fair' "].)

The Attorney General argues that this case is similar to *People v. Kelly* (2010) 47 Cal.4th 1008, where we considered whether an aspect of the legislatively enacted Medical Marijuana Program (MMP) impermissibly amended the Compassionate Use Act enacted by the voters. The Compassionate Use Act of 1996 (Health & Saf. Code, § 11362.5 et seq.) permitted individuals to possess and cultivate limited quantities of marijuana reasonably for "personal medical purposes" (*id.*, § 11362.5, subd. (d)) and provided a corresponding affirmative defense to criminal prosecution, but it did not impose specific quantity limits. (*Kelly*, at p. 1013.) The MMP did not amend the specific statutes enacted by the voters, but it did impose other restrictions, including quantity limits on the affirmative defense. We found this to be an unconstitutional amendment of the voter initiative because the

Legislature would "take[] away from rights granted by the initiative statute," which "guarantee[d] that a qualified patient may possess and cultivate *any amount of marijuana reasonably necessary for his or her current medical condition.*" (*Kelly*, at p. 1043.)

Unlike the legislation at issue in *Kelly*, Assembly Bill 333 does not intrude upon the purpose of Proposition 21. The purpose of Proposition 21 was to heighten the penalties for gang activity and other violent crimes. While narrowing the definition of "criminal street gang," Assembly Bill 333 does not change the punishment for those convicted of the gang-murder special circumstance. (See *Lee*, *supra*, 81 Cal.App.5th at p. 244, rev.gr. [applying Assembly Bill 333 here "does not change the punishment for 'murderers who kill as part of any gang-related activity,' the relevant purpose of Proposition 21"].)

*Gooden*, *supra*, 42 Cal.App.5th 270, is instructive on this point. There, the Court of Appeal held that Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which amended the mens rea for murder was not an impermissible amendment of Proposition 7 (Prop. 7, as approved by voters, Gen. Elec. (Nov. 7, 1978)) (Proposition 7), which increased the punishment for murder, or Proposition 115 (Prop. 115, as approved by voters, Primary Elec. (June 5, 1990)), which expanded the list of predicate offenses for the felony-murder rule. *Gooden* rejected the Attorney General's argument that Senate Bill 1437 amended Proposition 7 by taking away from the scope of conduct that constitutes murder punishable by the increased punishments specified in the initiative. (*Gooden*, at p. 281.) The court emphasized that "the elements of an offense and the punishment for an offense plainly are not synonymous." (*Ibid.*) Whereas Proposition 7 addressed the punishment for murder,

20

Senate Bill 1437 addressed only the mental state required to commit murder. (*Gooden*, at p. 282.) "Senate Bill 1437 did not address the same subject matter" as Proposition 7; rather, it "presents a classic example of legislation that addresses a subject related to, but distinct from, an area addressed by an initiative." (*Gooden*, at p. 282; accord, *People v. Nash* (2020) 52 Cal.App.5th 1041, 1059 ["While the class of individuals standing convicted of murder may be reduced in light of Senate Bill No. 1437's changes to the felony-murder rule and the natural and probable consequences doctrine, the legislation does not change or take away from the sentences those convicted of murder are subject to, which is the mandate of Proposition 7."].)

*Gooden*'s distinction between the electorate's focus on punishment and the Legislature's focus on the substantive elements of an offense applies here. The voters who enacted Proposition 21 wanted to harshly punish the members and activities of a "criminal street gang," but there is no indication that the voters had in mind a fixed meaning of the term. Murder committed by "an active participant in a criminal street gang" in order to "further the activities of the criminal street gang" (§ 190.2(a)(22)) is still punishable by death or life imprisonment without the possibility of parole, as provided by Proposition 21. The statutory amendments enacted by Assembly Bill 333 ensure that punishment is not imposed in other circumstances.

The Attorney General further notes that on several prior occasions in which the Legislature amended portions of section 186.22, the Legislative Counsel advised that the amendment required approval by two-thirds of each house. (See Legis. Counsel's Dig., Sen. Bill No. 444 (2005–2006 Reg. Sess.) 4 Stats. 2005, ch. 482, Summary Dig., p. 235 ["Existing law authorizes the Legislature to amend these provisions with a 2/3 vote of each

house."]; Legis. Counsel's Dig., Sen. Bill No. 1222 (2005–2006 Reg. Sess.) 6 Stats. 2006, ch. 596, Summary Dig., p. 333 [same].) But "the Legislature's views regarding the legality of its enactments are not binding on the judiciary." (*People v. Lopez* (2022) 82 Cal.App.5th 1, 21, fn. 5; see *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244.) In any event, " '[t]he Legislature remains free to address a " 'related but distinct area' " [citations] or a matter that an initiative measure "does not specifically authorize *or* prohibit." ' " (*Pearson*, *supra*, 48 Cal.4th at p. 571.)

Finally, we observe that the Attorney General does not argue against application of the amended definition of "criminal street gang" in all contexts, but only when applied to the gang-murder special circumstance. On this view, the narrower definition of Assembly Bill 333 would apply in all other circumstances, effectively making it easier to prove gang allegations for the purposes of imposing the death penalty or life imprisonment without the possibility of parole, and more difficult to impose the less serious consequences that flow from violations of section 186.22 itself. As one court has observed, "[i]t is difficult to discern a rational reason for such an anomalous choice." (*Lee*, *supra*, 81 Cal.App.5th at p. 242, rev.gr.)

## D.

The Attorney General relies on three cases applying the *Palermo* rule, but none supports a different result here. First, the Attorney General says the specific reference in Proposition 21 to section 186.22(f) is comparable to the specific reference in Vehicle Code section 23152 to subdivisions (a) through (f) of section 835.6 of the Penal Code, which were held to be time-

specific in *People v. Domagalski* (1989) 214 Cal.App.3d 1380 (*Domagalski*). The Attorney General notes that *Domagalski* synthesized the following rule from intervening cases applying *Palermo*: " 'Without exception, in each case where a statute, or some portion of it, was incorporated by reference to its section designation, the court found the reference to be specific and the effect was the same as if the adopted statute had been set out verbatim in the adopting statute, so that repeal or subsequent modification of the statute referred to [and] did not affect the adopting statute. Only in those cases where an entire body of law relating to a particular subject was adopted by reference did the court find the reference to be general so that subsequent amendments to the incorporated statute affected the adopting statute.' " (*Domagalski*, at pp. 1385–1386, fn. omitted.)

It is true that Proposition 21, like the statute at issue in *Domagalski*, refers to a specific subdivision of section 186.22 to define "criminal street gang." That subdivision, however, contains the *entirety* of the Penal Code's definition of "criminal street gang," whereas the referenced subdivisions of section 835.6 contain only a portion of the potentially relevant misdemeanor procedures that the Legislature could have chosen to incorporate into Vehicle Code section 23152 but did not. *Domagalski* also confirms that "the determining factor will be the legislative intent behind the incorporating statute," which may be assessed through the legislative history. (*Domagalski*, *supra*, 214 Cal.App.3d at p. 1386.) We endorsed the latter point in *Jovan B.*, including *Domagalski* among other "modern decisions" that "have applied the *Palermo* rule" while noting that "none have done so without regard to other indicia of legislative intent." (*Jovan B.*, *supra*, 6 Cal.4th at p. 816, fn. 10.) *Domagalski* is consistent with our analysis above.

The same is true of *In re Oluwa* (1989) 207 Cal.App.3d 439 (*Oluwa*), in which the Court of Appeal considered whether an inmate was subject to the custody credit calculation established by the voters through Proposition 7 or whether he was entitled to invoke more generous credit provisions later enacted by the Legislature. Proposition 7 contained a statement that " '[t]he provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code [article 2.5] shall apply' " in calculating custody credit for sentences like the inmate's in *Oluwa*. (*Oluwa*, at p. 442.) As described in *Oluwa*, article 2.5 contained three sections governing custody credit calculation at the time Proposition 7 was passed; the custody credits at issue were enacted as separate sections of article 2.5. (*Oluwa*, at p. 443.)

The Attorney General points to *Oluwa*'s statement that Proposition 7 was "not a reference to a system or body of laws or to the general law relating to the subject at hand," but rather was "a specific and pointed reference to an article of the Penal Code . . . at the time Proposition 7 incorporated article 2.5 into section 190." (*Oluwa, supra*, 207 Cal.App.3d at p. 445.) But *Oluwa* did not rest on a specific reference to article 2.5; rather, the court emphasized that the accompanying legislative analysis "advised voters that those persons sentenced to 15 years to life in prison would have to serve a minimum of 10 years before becoming eligible for parole" as provided in article 2.5 at the time Proposition 7 was adopted. (*Oluwa*, at p. 445.) *Oluwa* explained that allowing inmates like Oluwa to benefit from subsequent amendments that would reduce that minimum specifically presented to the voters would frustrate the voters' intent and constitute an impermissible legislative amendment of the initiative. (*Id.* at p. 446.) Here, by contrast, we have no

similar representation in the ballot materials accompanying Proposition 21 that applies or even mentions a specific definition of "criminal street gang," and thus no basis to infer that the voters intended to lock in such a definition.

The Attorney General also cites *People v. Anderson* (2002) 28 Cal.4th 767, which concerned the proper interpretation of section 26, a statute precluding duress as a defense to crimes "punishable with death." When section 26's predecessor was first enacted, this category of crimes included all forms of murder. The defendant argued that because only first degree murder with special circumstances is so punishable today, duress should constitute a defense to all forms of murder except first degree murder with special circumstances. (*Anderson,* at p. 773.) In other words, the defendant argued that the reference to crimes "punishable with death" in section 26 was general and therefore evolves with the changing nature of what constitutes a capital offense. After considering various indicia of legislative intent and the "anomalous[]" and "random results" that would result from the defendant's position, we held that duress is "not a defense to any form of murder" and that the reference in section 26 was specific. (*Anderson,* at pp. 775, 780; see *id.* at pp. 774–778.)

The Attorney General says "the reference [in Proposition 21] is even more specific than the reference at issue in *Anderson.*" This argument appears to draw the wrong lesson from *Anderson*. *Anderson* illustrates that a statutory reference that appears to be general can, upon inquiry into legislative intent, turn out to be specific. This case shows the reverse also can be true: the statutory reference in section 190.2 may appear specific, but the relevant indicia of voter intent show that the reference is general.

We conclude that applying Assembly Bill 333's definition of "criminal street gang" to the gang-murder special circumstance does not unconstitutionally amend section 190.2(a)(22). Accepting, as did the Court of Appeal, the Attorney General's concession below that the evidence presented at trial is not sufficient to sustain the gang allegations under Assembly Bill 333, we vacate the true finding on the gang-murder special circumstance in this case.

## CONCLUSION

We reverse the judgment below and remand for further proceedings consistent with this opinion.


**LIU, J.**


**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Rojas

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 80 Cal.App.5th 542
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S275835
**Date Filed:**  December 18, 2023

_____

**Court:**  Superior
**County:**  Kern
**Judge:**  John W. Lua

_____

**Counsel:**

Sharon G. Wrubel, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell and Susan Sullivan Pithey, Assistant Attorneys General, Dana Muhammad Ali, Idan Ivri, Louis M. Vasquez, Daniel B. Bernstein, Robert Gezi, Amanda D. Cary, William K. Kim and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

Kent S. Scheidegger and Kymberlee C. Stapleton for the Criminal Justice Legal Foundation as Amicus Curiae on behalf of Plaintiff and Respondent.

Gregory D. Totten for the California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Sharon G. Wrubel
Attorney at Law
P.O. Box 1240
Pacific Palisades, CA 90272
(310) 459-4689

Stacy S. Schwartz
Deputy Attorney General
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6099